**UNITED STATES of America**

v.

**Alcides del Rosario BETHANCURT.**

**UNITED STATES of America**

v.

**Corinthia ROBINSON, Sharon M. Goff, Esric Lugg.**

**Crim. Nos. 88–0188, 88–0149.**

United States District Court, District of Columbia.

Aug. 29, 1988.

---

**1428**

Scott Frederickson, Asst. U.S. Atty., Washington, D.C., for United States.

Gerald Robbins, Arlington, Va., for defendant Bethancurt.

Patricia Petty, Asst. U.S. Atty., Washington, D.C., for United States.

Patrick Hand, Washington, D.C., for defendant Robinson.

Shirli Marie Gray, Washington, D.C., for defendant Goff.

S. Edgar Wilhite, Washington, D.C., for defendant Lugg.

## OPINION

HAROLD H. GREENE, District Judge.

These cases all involve what may be called the second round of inquiry into the recently-enacted sentencing law and the guidelines issued pursuant thereto by the federal sentencing commission. An analysis of the facts and the law applicable to these cases indicates that the constitutional infirmities identified in the decisions handed down earlier this year by this and other courts do not by any means exhaust the list of problems presented by that statute and those guidelines. In fact, while most of the difficulties dealt with in the earlier decisions could probably be cured by a direct congressional enactment of the guidelines presently resting only on the authority of the commission, those being considered below appear to be far more intractable for they may be inherent in the fixed sentencing scheme established by the statute.

## I

On May 19, 1988, in *United States v. Brodie,* 686 F.Supp. 941 (D.D.C.1988), this Court declared unconstitutional the newly-enacted federal sentencing statute,[1] as a large number of other district courts had done and were to do all over the nation.[2] At the same time, in accord with several other tribunals (though not all), the Court stayed the effect of its decision because of the deference it felt it owed to a congressional enactment. However, it has now become apparent, on the basis of actual experience, that the constitutional problems discussed in *Brodie* describe only the most broadly conceptual legal difficulties presented by the statute and the sentencing commission's guidelines. By contrast, the defects discussed herein go to the heart of the actual sentencing function. The Court has concluded, based on real life experience with the new scheme that, absent a Supreme Court decision upholding them,[3] it would be imprudent to continue to apply the guidelines because to do so would require the Court to take actions at odds with law, fairness, and the public interest.

The difficulties with the guidelines are especially pronounced in the area of guilty pleas and plea bargaining—activities which account for the bulk of the dispositions of criminal cases in the federal courts[4] as well as in the state courts. Unless the political branches of government are prepared to authorize the appointment of very large numbers of additional judges, prosecuting attorneys, and supporting personnel, as well as the relatively vast expenditure of

---

1. 28 U.S.C. §§ 991–998, Title II of the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, 98 Stat. 1837.

2. The grounds included denial of due process, separation of powers, and improper delegation of legislative authority.

3. The issue of the Act's constitutionality is presently before the Supreme Court which is expected to hear argument in October of this year. *United States v. Mistretta,* — U.S. —, 108 S.Ct. 2818, 100 L.Ed.2d 920, 56 U.S. Law Week 384 (June 13, 1988).

4. Of 54,168 criminal cases disposed of by federal district courts in 1987, 37,816, or approximately seventy percent, were terminated by pleas of guilty.

funds that such measures would entail, plea bargaining will continue to occupy a prominent place in the achievement of criminal dispositions.[5]

As explained below, the new sentencing statute and the guidelines are riddled with conceptual and practical dilemmas in the plea bargaining area. These dilemmas, in turn, make it difficult, if not impossible, for courts to apply the guidelines in many situations, unless they are to affront directly the aim of sentencing uniformity—the central purpose of the new law—or to trench deeply on safeguards for fairness explicitly provided for or implicit in the due process clause of the Constitution and the mandate of Rule 11, Fed.R.Crim.P. For these reasons, the Court has decided in the exercise of its discretion [6] that it should not continue to apply the new sentencing statute at this time.[7] Accordingly, it will now lift the stay of the enforcement of its May 19, 1988 decision which it issued *sua sponte* on that date.

Several cases presently before the Court are directly affected by the infirmities and pitfalls inherent in the statute and the guidelines, and they illustrate the problems that broadly and detrimentally affect sentencing decisions at large. More specifically, the issues before the Court in the *Bethancurt* case discussed in Part II, *infra,* and those in the *Goff–Robinson–Lugg* cases discussed in Parts III and IV, *infra,* raise various aspects of the question whether the guidelines issued by the sentencing commission are consistent with continued large-scale plea bargaining and with fundamental fairness.

## II

Defendant Alcides del Rosario Bethancurt was indicted by a grand jury on May 19, 1988, of a violation of 18 U.S.C. § 1546 which renders illegal certain fraudulent activities, including forgery and misuse, with regard to alien registration cards, also known as "green cards." The maximum penalty provided by law for violation of this statute is imprisonment for a period of five years, or a fine of $250,000, or both, and a violation of the statute is a felony. Thereafter, on August 15, 1988, the United States Attorney filed an information to serve as a substitute for the earlier indictment, charging defendant with a violation of 18 U.S.C. § 1028(a)(4) which renders illegal various frauds in connection with identification documents.[8] The maximum penalty provided by law for violation of this statute is imprisonment for one year or a fine of $5,000 or both, and a violation is therefore a misdemeanor. The day the information was filed, the defendant appeared before the Court, offering to enter a plea of guilty to the section 1028 offense, a step that both sides described as being the product of a plea bargain.

The Court requested the prosecution to make the factual proffer required by Rule 11(f), Fed.R.Crim.P., and that proffer revealed, as did the response of defendant's counsel, that the document which defendant had misused, was a "green card" as described in section 1546, rather than merely the less formal identification documents protected by section 1028.[9] In the course of the proceeding before the Court, the parties at times described the plea as being one to a lesser included offense which the

---

**5.** Without such additional resources, and if most or all criminal cases had to proceed to trial, criminal and civil backlogs, and hence trial delays, would fairly rapidly increase to entirely unacceptable levels. *See also,* note 10, *infra.*

**6.** The grant or denial of a stay is of course a matter to be decided on the basis of equitable principles.

**7.** Should the Supreme Court rule that the statute is valid, lower courts (including this Court) will of course be bound (even though it is unlikely that the High Court will have before it more

than the bare constitutional issues dealt with in the decisions of the several district courts issued since April).

**8.** The understanding between the government and the defendant is that the section 1546 charge will be dismissed following completion of the plea bargain.

**9.** The document was covered by both statutes, but it is plain that, when an identification document rises to the level of an alien registration card, section 1546 is the more appropriate provision.

prosecution was willing to accept under the circumstances. At the conclusion of the proceedings, the Court deferred a decision with regard to the acceptance of the plea.

. This kind of plea to a lesser offense, or to a smaller number of violations than alleged in the charging papers, has been customary for a long period of time in both federal and state courts. Such pleas not only have not been particularly unusual or often substantively unexceptional as means for disposing of the business of the criminal courts, but it has been regarded as doubtful by many authorities that the criminal justice system could continue to function effectively, in view of the high volume of criminal cases, without such plea bargains and the time and resources they save.[10]

Prior to the enactment of the sentencing statute and absent the plea bargain, a judge could have imposed a sentence for the "green card" felony charged in Bethancurt's original indictment ranging from probation to imprisonment for five years.[11] The sentencing law and the guidelines ef-fected a significant change in this respect. When the computation required by the guidelines is made, the sentence of imprisonment that must be imposed—absent unusual or extraordinary factors justifying a departure[12]—is from 0 to 4 months.[13] Since such a sentence reflects the judgment of the sentencing commission pursuant to the mandate of the Congress, the Court is of course bound by its judgment.

As noted, the United States Attorney, pursuant to a plea bargain, reduced the charge against Bethancurt from the "green card" felony to the misdemeanor of a simpler type of fraud. This reduced offense carries a maximum penalty of imprisonment for a period of one year, and, had the crime been committed prior to the effective date of the sentencing statute, the Court would have had sentencing latitude from probation up to the one-year maximum. Under the new statute, the Court is, of course, once again bound to compute the sentence under the guidelines. Such a computation reveals a sentence of 0 to 4 months[14]—identical to that required for

10. The Court of Appeals for the Sixth Circuit pointed out in *Gray v. Commissioner,* 708 F.2d 243, 248 (6th Cir.1983), that plea bargaining is [w]idely recognized as an effective device to further important societal goal of reducing the number of criminal trials on crowded court dockets, *see, e.g., Bordenkircher v. Hayes, supra,* [434 U.S. 357] at 364, 98 S.Ct. [663] at 668 [54 L.Ed.2d 604 (1978)] (Supreme Court "has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forego his right to plead not guilty"); *Blackledge v. Allison,* 431 U.S. 63, 71, 97 S.Ct. 1621, 1627, 52 L.Ed.2d 136 (1977) (characterizing guilty plea and concomitant plea bargain as "important components of this country's criminal justice system"); *Santobello v. New York,* 404 U.S. 257, 261, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971) (disposition of charges after plea discussions considered essential and highly desirable part of the criminal process),....

11. The actual sentence would have depended upon a close scrutiny of the defendant's criminal, personal, employment, and family background and of the precise circumstances surrounding the offense, including the defendant's own degree of culpability.

12. *See* Chapter 5, Part K of the guidelines. The sentencing commission has made it quite clear that when it has considered a particular factor, that factor may not also be used by the court to justify a departure from the guidelines. *See* section 5K2.0 of the sentencing guidelines. Since the commission has already considered all but the most esoteric factors, valid departures are likely to be few in number. *See also,* note 32, *infra.*

13. The sentence is determined under the guidelines by correlating the base offense level with the defendant's criminal history category. The appropriate guideline provision for 18 U.S.C. § 1546 is 2L2.2(a), which calls for a base offense level of 6. Two levels must be subtracted on account of the defendant's acceptance of responsibility, resulting in an offense level total of 4. Bethancurt's criminal history category is I. Using this level and that category, the guideline sentencing table prescribes for the defendant a sentencing range of imprisonment of 0 to 4 months.

14. For 18 U.S.C. § 1028(a)(4), the appropriate guideline provision is 2F1.1(a), which, again, has a base offense level of 6. Two levels are once again subtracted for defendant's acceptance of responsibility. This leaves an offense level total of 4. Bethancurt has a criminal history category of I. Thus, according to the sentencing table, he would have to be sentenced to a period of incarceration of from 0 to 4 months.

the section 1546 felony.[15]

The obvious effect of that concurrence in sentences is that Bethancurt will receive no sentencing benefit whatever from his plea: the sentencing range is the same either way, whether he pleads guilty to the felony or to the misdemeanor.[16] Indeed, the even more striking fact is that, if the defendant had elected to go to trial on the original felony charge and had been convicted of that charge following trial, rather than to plead guilty to the misdemeanor, his guideline sentence would have been no more severe in the former case than in the latter: it would be 0 to 4 months in each · instance.[17]

It is obvious from this discussion that, when in an instance such as this, a bargain for a misdemeanor guilty plea is made between the parties and accepted by the court, the defendant is in effect induced by the "system," including the judge, the prosecutor, and the defense attorney, to plead to what he believes to be a lesser offense—lesser, that is, in its punitive consequences to him—when, in fact, because of the guidelines, the sentence will in all probability be identical to that which could and would have been imposed had he proceeded to trial on the more serious charge or charges. The benefit to the defendant from giving up his right to a trial, with the ever-present possibility of an acquittal, will thus be entirely illusory.[18] It is unseemly, and it may be a violation of Rule 11, Fed.R. Crim.P.,[19] and possibly of due process, to

mislead the defendant in so fundamental a respect in order to induce him to plead guilty.

In the view of this Court, it should not participate in a scheme which implicitly or explicitly promises the defendant that his plea will bring him more lenient treatment when, under the guidelines, that is not what will occur. More concretely, the Court has concluded that, in order to avoid misleading criminal defendants in this respect, it should advise such defendants of this fundamental fact at the time of the taking of the plea, or in any event prior to the time that sentence is imposed, so as to permit a withdrawal of the guilty plea.

If other judges should agree with this assessment, the result may well be that the number of consummated plea bargains will fall substantially, while the number of trials in criminal cases will rise to a corresponding degree. That, however, is an inevitable consequence of the new sentencing law and procedures, coupled with the need for fairness in the administration of justice.

For the reasons stated, defendant Bethancurt will be recalled before the Court; the Court will explain to him the consequences of the various courses of action as related above; and it will afford him the opportunity to withdraw his guilty plea at that time or to reaffirm that plea after having been fully apprised of the available options.

---

**15.** What this means, of course, is that the sentencing commission treats the two crimes as equal in gravity even though the Congress has decided, by a statute passed by both Houses and signed by the President, that one is five times more serious than the other.

**16.** It may be that this defendant, an alien, will receive a benefit unrelated to the criminal justice system and the punishment process. If an alien is convicted of or pleads guilty to a misdemeanor, the Immigration and Naturalization Service may permit him to leave this country voluntarily, thereby avoiding exclusion from the United States based upon a prior deportation. 8 U.S.C. §§ 1182(a)(17) and 1251(a)(4). Furthermore, 8 U.S.C. § 1182(a)(9) provides that an alien who is convicted of or pleads guilty to a felony may be excluded from the United States for a period of five years while a defendant convicted of or pleading guilty to a misdemean-

or subject to imprisonment for up to six months labors under no such statutory restriction.

**17.** The offense level of course is still 6. Under guideline section 3E1.1(b), a defendant "may be given consideration [for acceptance of responsibility] without regard to whether his conviction is based upon a guilty plea or a finding of guilt by the court or jury . . . ."

**18.** *Compare North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

**19.** The purpose of Rule 11 is to ensure that the plea is voluntary, and is not induced by threats or promises, and that the defendant possesses an understanding of the law in relation to the facts. *See, e.g., McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1170–1171, 22 L.Ed. 2d 418 (1969).

### III

The Court now considers the second alternative: that a plea bargain results in punishment that is substantially less severe than would have been imposed but for the bargain. This alternative, while obviously avoiding the pitfall discussed in Part II, *supra*, gives rise to another, equally disturbing problem: disparity in sentencing between equally situated defendants will not be alleviated by application of the new statute but the responsibility therefor will merely be shifted from the judge to the prosecutor. The *Goff-Robinson-Lugg* cases suffer from and illustrate this difficulty.

On April 13, 1988, a grand jury returned separate indictments against defendants Corinthia Robinson and Sharon Goff, charging each with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a); managing an apartment for the purpose of unlawfully distributing cocaine base (operating a "crack" house), in violation of 21 U.S.C. § 856; and carrying a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c). A superseding indictment was returned on May 9, 1988, reiterating the previously charged counts against Goff and Robinson, and additionally charging these two defendants as well as Esric Lugg and several others with conspiracy to distribute cocaine in violation of 21 U.S.C. § 846.

Due to the quantity of drugs involved in the possession with intent to distribute charges, defendants Goff and Robinson, if found guilty, would each have been required to serve a minimum sentence of imprisonment mandated by Congress: in the case of Goff, this would have been a ten-year mandatory minimum due to her alleged possession of 50 grams or more of cocaine base, 21 U.S.C. § 841(b)(1)(A); and in the case of Robinson, a five-year mandatory minimum due to her alleged possession of 5 grams or more of cocaine base, 21 U.S.C. § 841(b)(1)(B). Further, if Goff and Robinson were found guilty of using a gun in the commission of these drug crimes, they would have faced an additional statutorily-required consecutive five-year sentence. 18 U.S.C. § 924(c). Thus, had they gone to trial and been found guilty of all the charges levied against them, the Court would have been required by statute to impose, at a minimum, a fifteen-year sentence of incarceration on Goff, and a ten-year sentence on Robinson. Defendant Lugg, on the other hand, who was charged only with conspiracy, was not exposed to any mandatory minimum.

On June 23, 1988, with the agreement of the prosecution, Robinson and Goff entered guilty pleas to the single charge of maintaining a place for storing and distributing a controlled substance, an offense which carries no statutory minimum sentence. Under the terms of the plea bargains, the prosecution agreed to dismiss all the remaining counts of the indictment upon defendants' cooperation,[20] and to move the Court for a departure from any sentence of imprisonment mandated by the sentencing guidelines.[21] Defendant Lugg was tried and convicted on June 29, 1988 of conspiracy, the only crime with which he was charged. The consequences of these events are interesting; they highlight the problems with the new law and the guidelines; and they have given rise to persuasive representations by Lugg's counsel.

With respect to the single offense to which the prosecution indicated its willingness to accept guilty pleas from Goff and Robinson in lieu of the four initial charges, the sentencing commission guidelines provide for each defendant a range of imprisonment of from 21 to 27 months,[22] com-

---

**20.** This concession was contingent also upon defendants' testifying against the remaining co-defendants.

**21.** The government may fulfill this obligation by filing a motion pursuant to 18 U.S.C. § 3553(e), requesting a sentence below the guideline range, or by moving for reduction of sentence under Fed.R.Crim.P. 35(b). Section 3553(e) motions were filed on behalf of both defendants. As no

sentence has yet been imposed, a Rule 35(b) motion would not yet be proper.

**22.** This guideline range is arrived at as follows:

| | |
|---|---|
| Base offense level for maintaining premises | 16 |
| Possession of firearm in commission | +2 |
| Acceptance of responsibility | −2 |
| Total offense level | 16 |
| Criminal history level | I |

pared to the 180 months minimum [23] required by statute for Goff and the 120 months minimum [24] for Robinson on those original charges (which presumably reflect the actual offense behavior of these defendants).[25] Additionally, as indicated above, the prosecution has promised that it will move the Court for a further reduction of the sentences by a departure from the guidelines.

By way of contrast, with respect to the one offense of which Lugg was convicted, the sentencing commission guidelines provide a range of imprisonment of from 210 to 262 months.[26] It is, however, entirely clear from the evidence that the roles of Goff and Robinson in the conspiracy did not vary so substantially from that of Lugg that any judge, exercising judicial discretion, would have imposed on the latter *a sentence ten times as long* as that given to the former. Yet that is the result of the combination of the prosecutor's charging choices and the "vending machine" scheme set up by the guidelines (210–262 months versus 21–27 months). That kind of mandated disparity [27] and total lack of proportionality may well offend the Fifth Amendment guarantee of due process.[28] Moreover, as will now be seen,

---

An offense level of 16 coupled with a criminal history level of I, requires under the guidelines table a sentence of 21 to 27 months.

When the Court questioned defendants' expectations as to their ultimate sentences at the time of the taking of the pleas, the prosecutor and defense counsel informed the Court that the defendants could expect their guideline sentences to be in the range of 10 to 14 months—even less than the 21 to 27 months actually called for by the guidelines. The Court advised the defendants, however, that it would not be bound by the 10 to 14 month expectation but would impose sentence on the basis of whatever information was provided by the probation office.

The confusion which continues to exist with respect to the guidelines is further illustrated by the fact that counsel for Robinson most recently proposed yet a third range as being correct under the guidelines—8 to 12 months of imprisonment.

**23.** The maximum sentence under the statute enacted by Congress on the possession with intent to distribute charge lodged against Goff is life imprisonment; on the "crack house" charge an additional twenty years; and on the firearms charge an additional five years (consecutively and without probation or parole), or a total of life plus twenty-five years.

**24.** The maximum sentence under the statute enacted by Congress on the possession with intent to distribute charge lodged against Robinson is imprisonment for forty years; on the crack house charge an additional twenty years; and on the firearm charge an additional five years (consecutively and without probation or parole), or a total of sixty-five years.

**25.** Under the philosophy enunciated by the sentencing commission, the sentence imposed pursuant to a guilty plea should adequately reflect the seriousness of the actual offense behavior. *See* section 6B1.2(a) of the guidelines.

**26.** The guideline range is arrived at as follows:

| | |
|---|---|
| Base level offense | 32 |
| (117.05 grams cocaine base involved) | |
| Use of firearm in commission | +2 |
| Role in offense adjustment | +3 |
| Total offense level | 37 |
| Criminal history level | I |

An offense level of 37 and a criminal history level of I requires under the guidelines table a sentence of 210–262 months.

**27.** Unlike the differences in sentencing which may at times have come about before the enactment of the new sentencing law—when judges were exercising their informed discretion in imposing sentence—the current disparities are the result of a mechanical application of commission guidelines to charges brought, enhanced, or reduced at the discretion, or whim, of prosecutors.

**28.** That concern is heightened by the vagueness and ambiguity of many of the guideline concepts. For example, the presentence report prepared by the probation office assesses defendant Lugg with additional levels of responsibility for his role as a manager or supervisor in the criminal activity, and for possession of a firearm during the event. Yet these terms, for all their seeming scientific precision, are not only not very useful to those who must impose sentence; they are endlessly susceptible of manipulation, as follows.

First. Section 3B1.1 and 3B1.2 of the guidelines provide that a defendant's offense level may be increased or decreased, depending upon his role in the crime. Thus, if the defendant is a "manager or supervisor," the offense level is increased by three; if he is a "minimal participant" it is reduced by four; if a "minor participant" it is reduced by two levels. The effects of these particular categorizations are enormous; *e.g.*, the increase in Lugg's offense level by three for his alleged role as a "manager" increases his minimum sentence under the guidelines from

these variations in punishment[29] fly in the face of the dominant congressional purpose underlying the enactment of the new law— that of eliminating unwarranted disparity. *See* 28 U.S.C. § 991(b)(1)(B); S.Rep. No. 553, 96th Cong., 2d Sess. at 944 (1980).

## IV

According to the Senate Report accompanying the sentencing statute, Congress expects judges "to examine plea agreements to make certain that prosecutors have not used plea bargaining to undermine the sentencing guidelines." S.Rep. No. 98–225, 98th Cong., 1st Sess. 63, 167 (1984), U.S. Code Cong. & Admin.News, 1984, pp. 3182, 3246, *see also*, 28 U.S.C. § 994(a)(2)(E). It

is presumably in accordance with that direction that section 6B1.2 of the guidelines provides that if a plea bargain, such as that in *Goff–Robinson*, includes an agreement to dismiss charges or not to pursue other, "the court may accept the agreement [only] if the court determines, for reasons stated on the record, that the remaining charges adequately reflect the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing." Indeed, the sentencing commission itself has noted that policy statements governing the acceptance of plea agreements under Rule 11(e)(1), Fed.R.Crim.P., are intended to ensure, *inter alia*, that plea negotiation practices do not perpetuate unwarranted sen-

---

151 months to 210 months—a jump of five years in the federal penitentiary. Although the consequences are vast, the definitions are obscure; no one can know with any degree of precision what a "manager" is under the guidelines, as distinguished from a "leader," "organizer," or "participant." Moreover, Lugg was not charged as a manager, and the jury did not convict him of being a manager. That concept, and the additional punishment is requires, was added in the most informal way after the conviction. Similarly, the guidelines offer little useful guidance on the difference between a "minimal" participant and a "minor" participant. *See* note 29, *infra*.

Second. Equally objectionable, though for a somewhat different reason, is the direction that the offense level be enhanced by two for possession of a firearm during the commission of the offense. Comment 3 to guideline section 2D1.1 states that the weapons adjustment should be applied "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Yet, unlike Robinson and Goff, defendant Lugg was never charged with a firearms offense; there was accordingly no jury finding with respect thereto; and no evidence was presented at his trial to connect him to a firearm, except for testimony that one was found in an apartment where he resided together with others, including defendant Robinson. Nevertheless, the guidelines require an increase in Lugg's sentence by 42 months. It is unlikely that so strange a result could survive a due process analysis.

**29.** As counsel for Lugg correctly argues, this disparity cannot be justified by the Goff and Robinson guilty pleas or their promises of cooperation with the government. The guidelines allow a reduction amounting to only two levels for an acceptance of responsibility (assuming for present purposes that this may be equated

with a plea of guilty), and while the prosecution may move for a departure from the guideline sentence on account of substantial cooperation, that is not what it did; instead it engaged in a wholesale obliteration of charges. Additionally, the roles of these defendants in the offenses, if considered "minor" (*but see* note 28, *supra*), would entitle each to a four level reduction. However, even a reduction in their offense levels amounting to a total of six levels would still subject Goff and Robinson to a sentencing range of 63–78 months (on a 26 guideline level), rather than the 21–27 months to which the Court is limited on the charges the prosecution has chosen most recently to pursue.

Furthermore, since the crimes reflecting their actual offense behavior with which these two defendants were charged carried minimum sentences mandated by statute, but for the prosecution's magnanimity Goff's proper sentence would have 180 months and Robinson's 120 months. In short, the enormous sentencing disparity between Lugg, on the one hand, and the Goff–Robinson duo, on the other, is due not to objective factors but to the prosecution's charging decisions.

Finally, lest it be assumed that the instant cases are somehow extraordinary and could therefore be adjusted on a case-by-case basis by a court-required "departure" from the guidelines (*but see* note 12, *supra*, and note 32, *infra*), the fact is that the instant prosecutorial decisions are typical of charging policies generally. It is not the particular decisions made here that are at fault; the problem lies with a scheme which vests enormous discretion in prosecutors, thus allowing them to give free reign to disparity-inducing policies, while prohibiting the authority of judges to look at fairness both individually and with respect to defendants generally who come before the courts.

tencing disparity.[30]

It is difficult to see how, consistently with the design of the sentencing law, it could be otherwise, given the basic purpose of that law. The central aim of the new sentencing statute is to eliminate unwarranted disparity in sentencing. That objective is not achieved, and the discretion to impose disparate sentences for equally situated offenders is simply shifted from judges to prosecutors, if the latter are free to pick and choose among the charges, and thus to manipulate the expected sentences, whether this is done as part of a plea bargain or otherwise.

The guidelines prescribe specific sentences, down to the number of months or years of imprisonment, the amount of any fine, restitution, the period of supervised release, and the like, depending upon the offense and the defendant's prior history. *Thus a prosecutor who knows the defendant's criminal and other background, is able, by his charging decision alone*[31] *to decide not merely on the defendant's general exposure to punishment, but on the precise sentence that must*[32] *and will be imposed.*[33] While the judge would still pronounce the sentence, he would merely parrot a decision already made by the prosecutor.

A shift from judges to prosecutors effectively to determine criminal sentences, and to do so on the basis of a tailoring of charges to individuals, plainly would, in the words of the Senate Report, "undermine the sentencing guidelines." Indeed, under this system, the departures from uniformity of punishment for equal culpability would be more pernicious than under the traditional judge-determined sentencing scheme if only because, when a judge fashions a sentence, he does so on the record, in an action that is there for all the world to see, while a prosecutor's decision to file an information at the level of a particular charge is made behind closed doors.[34] This shift is aggravated by the fact that prosecutors are far more subject to political, career, and other pressures than are lifetime judges.[35]

In sum, if the elimination of sentencing disparity was the goal the Congress had in mind when it enacted the new law, it achieved that objective only in the context of judicial sentencing: prosecutorial decisions are likely to result in as much unwarranted sentencing disparity as existed before, if not more so, and they will do so

---

**30.** Sentencing Guidelines, p. 6.5. The commentary to this guideline notes that when an agreement to dismiss charges or not to pursue others is contingent on acceptance of a plea agreement, the court's authority to adjudicate guilt and impose sentence is implicated, and "the court is to determine whether or not dismissal of the charges will undermine the sentencing guidelines."

**31.** That decision is the only significant variable other than the defendant's background.

**32.** Under the guidelines, the sentencing range is absolutely fixed, barring a judicially-crafted departure from the guideline sentence. However, where the prosecutor selects the applicable statute and has the power to inform the judge with respect to the circumstances of the offense and the defendant's relationship with the government, it is unlikely that any judicial departures from the guidelines could be justified. *See also,* note 12, *supra.*

**33.** In fact, counsel for the prosecution and counsel for defendants Goff and Robinson met prior to the hearing on the guilty plea and came to an agreement—albeit an erroneous agreement (*see* note 22, *supra*)—on the precise sentence that was to have been imposed on the two defendants.

**34.** An indictment is in theory the product of a grand jury decision, but in practice the prosecutor determines, in all but the most unusual circumstances, what the statutory charge shall be.

**35.** As Professor Alshuler has pointed out, "... fixed and presumptive sentencing schemes ... are unlikely to achieve their objectives so long as they leave the prosecutor's power to formulate charges and to bargain for guilty pleas unchecked. Indeed, this sort of reform is likely to produce its antithesis—a system every bit as lawless as the current sentencing regime, in which discretion is concentrated in an inappropriate agency, and in which the benefits of this discretion are made available only to defendants who sacrifice their constitutional rights." Alshuler, *Sentencing Reform and Prosecutorial Power: A Critique of Recent Proposals for "Fixed" and "Presumptive" Sentencing*, 126 U. of Pa.L.Rev. 550–51 (1977).

under conditions of decreased fairness.[36]

## V

There are indications in the guidelines that the sentencing commission may have envisioned a role for the courts in this process in amelioration of the broad prosecutorial authority. Unfortunately, however, the signals are contradictory. As explained in Part IV, *supra,* Congress seems to have expected the courts to ensure that plea agreements would not be used to undermine the sentencing guidelines. It would seem to follow that, if it appears in a given case that the plea bargain is such that the charge reduction, or the dismissal of some charges, results in a sentence that differs significantly from the guideline sentence normally applicable, a court could validly accept the bargain and the plea only if it is satisfied that the reduction had a valid basis independent of a disregard of the applicable guidelines.

Although this is so in theory, its application in practice raises well-nigh insurmountable obstacles. In order properly to carry out this function, courts would not infrequently have to probe into the correctness and the adequacy of the prosecution's representations regarding the basis and the purposes of the particular reductions. Yet the performance of this task would raise significant problems, possibly of a constitutional dimension, for a court could effectively carry out its responsibilities in that regard only by intruding, improperly it would seem, into executive prerogatives. For example, if the prosecutor claimed that the evidence in his possession was not sufficient or not sufficiently credible to sustain a charge presumptively called for by the seriousness of the defendant's behavior, a court might have to review the evidence, actual or potential, on its own to satisfy itself that the charge reduction did not have some other purpose.

In the *Goff–Robinson* cases, for example, the prosecution appears to have reduced the charges against the defendants because of their expected pleas of guilty and their promised cooperation with the government. Yet as explained above, the guidelines do not sanction the relatively enormous charge reductions on the basis of these factors and, if the Court were to carry out its responsibility to see to it that the guidelines are not being subverted, it might have to probe deeply into any additional decisionmaking rationale that motivated the prosecutors.

Such inquiry is apparently foreclosed, however, by other directions provided by the sentencing commission. The commission has plainly stated that the requirement in Rule 11(e) of the Federal Rules of Criminal Procedure—that charges remaining following a plea bargain must reflect the seriousness of the actual offense behavior—"does not authorize judges to intrude upon the charging discretion of the prosecutor." [37] This reservation would appear to leave prosecutors free to employ their charging discretion as they see fit, without any judicial interference or inquiry. If that is a correct understanding of the guidelines, the problem discussed in Parts III and IV above becomes acute: defendants with like culpability could be charged, and consequently sentenced, without judicial in-

---

**36.** It is difficult to escape the conclusion that defendants Goff and Robinson were met at the courthouse door with four overwhelming charges (carrying sentences of imprisonment of *up to life plus twenty-five years, and sixty-five years, respectively—see* notes 23 and 24, above) as means for pressuring them to plead guilty and to cooperate with the prosecution. How else could one explain the prosecution's concurrence just a short while later in a *ten to fourteen month* sentence (*see* note 22, above)? At the same time, their co-defendant Lugg, charged with but a single offense, will be required under the guidelines actually to serve about *twenty years* in confinement. In the terms of the sentencing commission's guidelines—which of these wildly disparate sentences will reflect the "seriousness of the actual offense behavior" (*see* note 25, above)? There is every reason to believe that this kind of crass disparity in treatment will be the rule rather than the exception in criminal cases in the federal courts, and that such disparity, rather than the theoretical assumptions made by the Congress and the commission, will be the end result of the enormous congressional and agency effort expended to eliminate unwarranted differences in sentencing treatment.

**37.** Sentencing Guidelines, pp. 6.6–6.7.

quiry and without regard to the objectives of uniformity and elimination of disparity.

It may be that the several, apparently contradictory, guidelines and commentaries on plea bargaining and the judicial role with respect thereto simply indicate that the sentencing commission left the issue unresolved because it was unable to square the circle—that it recognized that the issue of of the judicial involvement in this scheme entails unacceptable consequences, whatever the choice made.[38]

This dilemma is probably inherent in a scheme which rigidly binds the courts with respect to the exercise of discretion in sentencing decisions but cannot, in practice, bind prosecutors, and is therefore insoluble in the context of a rigidly fixed sentencing statute such as the sentencing law recently enacted by the Congress.[39] In any event, this Court does not believe that it has the constitutional power to probe deeply into the underlying reasoning of criminal prosecutors and the adequacy of their evidence.[40] At the same time, it does not wish to interpret the sentencing statute so as to defeat its entire rationale—the elimination of unwarranted disparity—by construing it to leave to prosecutors wide latitude in charging and thus, inferentially, wide latitude in the fashioning of criminal sentences. The Court's reluctance in that regard is not based on amorphous considerations: after all, it is the Court that has the responsibility for imposing sentence after the scheme with its various ramifications has been all played out.[41]

It may be that the Supreme Court, as part of its consideration of the *Mistretta* case now before it, will decide or illuminate these issues. The most prudent course for this Court in the meantime, given the imponderable factors discussed *supra,* as well as the uncertain constitutionality of the Act, is to follow prior, well established sentencing law. Accordingly, the stay this Court announced in *Brodie, supra,* is hereby lifted and the Court will, for the time being,[42] abide by prior law.

Sharon Goff, Corinthia Robinson, and Esric Lugg will be required to appear again before the Court, Lugg to be sentenced under prior sentencing law, and Goff and Robinson to have the benefit of an explanation of the consequences of a maintenance of their pleas and to be given the opportunity to withdraw these pleas should that be their decision.

---

**38.** On the one hand, if the prosecutor's charging discretion in a plea bargain situation is subject to a judicial determination of consistency with the guidelines, the court, to carry out that responsibility, would have to intervene in subjects of executive responsibility to a possibly unconstitutional degree. On the other hand, if the prosecutor's charging discretion is not reviewable by the courts, the problem of unequal sentencing for equal culpability remains as problematic as before, if not more so.

**39.** For that reason, the sentencing commission cannot be blamed for all these difficulties. It obviously had to take the statute as it is.

**40.** In order properly to carry out its responsibilities, a court might even be required to consider, *inter alia,* evidence that could have been, but was not, presented to the grand jury.

**41.** The relationship between the invasion of the judicial function by this scheme and the retention of a seeming judicial responsibility for imposing sentence would appear to bridge the concerns over the problems discussed herein with those related to the constitutional issues involved in *Mistretta, supra,* and in *Brodie, supra.*

**42.** *See* note 7, *supra.*